## United Railway Supply & Service, Ltd. v. Boston and Maine Corp.

[535 A.2d 325]

No. 83-159

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes,*  JJ.**

Opinion Filed August 14, 1987

Motion to Reargue Denied October 2, 1987

---

* Justice Hayes was present for oral argument but did not participate in this decision.

455

*William R. Brooks* and *A. Gregory Rainville* (On the Brief) of *Tyler, Bruce & Brooks*, St. Albans, for Plaintiff-Appellee.

*Harry A. Black* and *E. Barclay Jackson* (On the Brief) of *Black, Black & Shreve*, White River Junction, for Defendant-Appellant.

**Allen, C.J.** Defendant Boston and Maine Corporation (B&M) appeals from a judgment in favor of United Railway Supply & Service, Ltd. (United) in a suit on a contract to refurbish old commuter railroad coaches. The action involved a dispute over what services were included within the per-car price and which ones warranted additional compensation. We affirm.

The parties entered into a contract on November 17, 1977, under which United was obligated to refurbish old commuter railroad coaches, owned by the Massachusetts Bay Transportation Authority (MBTA) and operated by B&M, for a set price of $49,400 for each completed car. While the contract attached work specifications, it did not promise a set number of cars, and the term of the agreement was open-ended.

In early December, 1977, the first cars arrived at plaintiff's plant in White River Junction. They were dilapidated. One car was to be "cannibalized" to provide parts for the others. The search for parts and the cannibalizing process slowed production. On February 22, 1978, a representative of MBTA inspected the first finished car. The following day, Frank G. Fotta, the general manager of B&M commuter services, inspected the car and submitted a list of services he required to be performed in order to

render the car acceptable under the contract. United took the position that some of the listed items were not included in the flat contract price of $49,400 per car. In May, 1978, when United sent B&M the first completed cars, it also sent invoices itemizing charges for wainscotting and windowsills, which United asserted were charges for extra work. In response, B&M wrote a letter, dated June 6, 1978, stating that the original contract included wainscot and windowsill work. The letter ended:

> [I]f you are unable to comply with the originally agreed upon contract, please advise so that appropriate alternative action may be taken. We are withholding shipment of the next two coaches pending your advice in this matter.

There was testimony disclosing that Fotta informed an officer of United that B&M would cancel the contract, not ship any more coaches and withhold money already due under the original contract. The officer of United thereafter wrote "cancelled" across the invoices, and agreed that the items listed as extras in the June 6 letter were part of the original contract, with which United would comply.

The parties are in accord that United acceded to B&M's demand in the June 6, 1978 letter in order to induce B&M to continue shipping cars for United to refurbish. By September 19, 1978, B&M had sent thirteen cars to White River Junction. United continued to do the work it had considered "extra" in B&M's June 6, 1978 letter. United invoiced each car on delivery, and B&M paid the contract price for each car, plus an amount for "authorized" extras, less an amount reserved for the correction of certain deficiencies. In January, 1979, United sent an additional invoice for what it considered extra work performed on all thirteen cars it had refurbished. The billing included the wainscotting and windowsill work performed on the two cars which had been the subject of the cancelled invoices in June, 1978, and similar work performed on subsequent cars. B&M refused to pay the additional sums included in the January, 1979 billing.

United brought the present action, asserting that it had waived its claim for the "extras" under duress, and, in addition, that B&M had failed to deliver parts required by the contract in a timely manner, resulting in further unwarranted costs to United. The jury found that United acted under duress when it waived its claim for the "extras," and awarded $61,083 in damages. The jury

also found that B&M violated its contract by failing to deliver parts as required, causing United an additional $19,500 in damages.

■ B&M maintains that the question of whether economic duress voided United's waiver of claims for payment of "extras" is applicable only to the work already performed and that the court erred in not so limiting its instructions on damages. B&M did not object to the jury instruction on duress or the special verdict form which presented the duress issue to the jury and may not assign as error the instruction as given. V.R.C.P. 51(b). The failure to object to jury instructions precludes appellate review of those instructions. *Collette* v. *Bousley*, 141 Vt. 373, 374, 449 A.2d 936, 937 (1982).

■ B&M further argues on appeal that the issue should not have been submitted to the jury. While B&M moved for a directed verdict at the close of United's case and at the close of all of the evidence, it did not raise in those motions the issue it now seeks to raise on appeal. A motion for a directed verdict must "state the specific grounds therefor," V.R.C.P. 50(a), and issues not raised before the trial court may not be raised for the first time on appeal. *Addison County Automotive, Inc.* v. *Church*, 144 Vt. 553, 559, 481 A.2d 402, 406 (1984).

Next, B&M argues that the trial court erred in allowing the jury to consider whether it violated the contract by failing to deliver parts in timely fashion. B&M contends that it was the court's duty to construe the contractual language. According to B&M, the contract was clear and unambiguous, and it did not include any written obligation for B&M to supply parts. Such an obligation, in B&M's view, could not be considered implied because the contract provided that United was obligated to supply "all materials needed for refurbishing, except any wheels and axles." B&M argues that "parts" were subsumed within the word "materials," and that plaintiff had no right to expect defendant to supply parts for refurbishing the cars.

■ It is the law in Vermont that when the court determines that a contractual provision is ambiguous, the intent of the parties becomes a question for the trier of fact. *Trustees of Net Realty Holding Trust* v. *AVCO Financial Services of Barre, Inc.*, 144 Vt. 243, 249, 476 A.2d 530, 533 (1984). Extrinsic evidence may be used to aid the trier of fact when a provision is found to be ambiguous. *Id.*

In this case, the court determined that the intent of the parties was unclear from the contract terms. The court allowed extrinsic evidence to be taken. According to United, the word "materials" was intended to cover paint, upholstery, screws, bolts, and other substances or primary materials not specifically designed as components of B&M's rail cars. In United's view, compressors, air conditioner units, seats, and other specific components of the cars were considered "parts" to be supplied by B&M.

■ B&M's interpretation of parts as "materials" would have required United to obtain in the marketplace items originally manufactured for use in B&M's cars. Furthermore, B&M's interpretation of "materials" in one section of the contract is inconsistent with another section which states that United, "[a]fter completion of the refurbishing of all cars authorized . . . will return all unused *parts or equipment furnished by the trustees (B&M)* . . . ." (Emphasis added.) In fact, the record reveals that B&M supplied parts, as United would define them, including the car that was shipped to be cannibalized. In sum, the court did not err in its instruction on the issue whether B&M violated the contract by failing to deliver parts in a timely manner.

Finally, B&M asserts that United's exhibit representing a summary of charges for work done months previously, prepared for the instant litigation, was not admissible under the hearsay exception of V.R.E. 803(6), concerning the admissibility of business records. The exhibit was prepared from, and was a summation of, time cards kept in the ordinary course of United's business. In *Westinghouse Electric Supply Co.* v. *B.L. Allen, Inc.*, 138 Vt. 84, 413 A.2d 122 (1980), account data, kept in the ordinary course of business, were summarized in a computer printout in preparation for suit. The Court held:

> The appellant maintains that the printout was not made in the regular course of business, but prepared by Westinghouse to pursue its legal remedies.

> This argument exalts the form over the substance. The retrieval from the taped record . . . was made for the purposes of the trial. But, the taped record and the information and calculations thereon were made in the usual course of business and for the purpose of the business alone. There is no merit to this contention.

*Id.* at 100, 413 A.2d at 132 (quoting *Transport Indemnity Co.* v. *Seib,* 178 Neb. 253, 260, 132 N.W.2d 871, 875 (1965)).

In the instant case, the evidence in the exhibit was not a computer printout, but was prepared manually. Arguably, the link between original entry and summary document is weaker here, where it required human intervention for accurate retrieval of the data, rather than computer retrieval. In either case, however, the data before the court were originally entered and maintained in the ordinary course of business activity. The keeper of these original records testified below and was cross-examined. B&M had ample opportunity to inquire into the methods used by the custodian to summarize the information kept in the ordinary course of business. B&M was thus able to explore the information's reliability and to question the methods by which it was summarized. The court properly admitted the exhibit.

*Affirmed.*

